UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MADISON PROJECT, et al.,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>CENTRAL INTELLIGENCE ACENCY,<br><br>    *Defendant.* | Civil Action No. 1:22-cv-00321 (CJN) |

**MEMORANDUM OPINION**

In this FOIA action, plaintiffs seek to compel the CIA's disclosure of various elements of its intelligence assessment concerning the mysterious health condition commonly known as Havana syndrome. The CIA moves for summary judgment on the grounds that it has conducted an adequate search for responsive records and produced all those that are not exempt. Having now reviewed the CIA's supplemental classified declaration, the Court agrees and grants the CIA's motion.

**I.  Background**

    **A.  Factual Background**

In recent years, hundreds of federal government officials and their family members have reported experiencing "anomalous health incidents" (AHIs) while at their foreign and domestic posts. ECF No. 4 (Compl.) ¶ 7; ECF No. 22-1 at 3, 7–8. The reported symptoms vary, but tend to include headaches, dizziness, nausea, and cognitive impairment, often preceded by the perception of a loud noise or a change in pressure. *See* ECF No. 22-1 at 7. Because AHIs were first reported by officials stationed at the U.S. Embassy in Cuba, they have been colloquially referred to as "Havana syndrome." *Id.*

1

After news of the AHIs became public, some media outlets and scientists speculated that they could be the result of "directed-energy weapons" deployed against American spies and diplomats by a foreign adversary. *See, e.g.*, Compl. ¶ 7 (citing, *inter alia*, William J. Broad, *Microwave Weapons Are Prime Suspect in Ills of U.S. Embassy Workers*, N.Y. TIMES, Sep. 1, 2018). But on January 19, 2022, media reporting announced that the CIA had determined that "most cases" of AHIs were "unlikely" to have been caused by "a sustained global campaign by a foreign power" and could instead be explained by "other causes"—like environmental factors, undiagnosed medical conditions, or stress. *See id.* ¶ 8; ECF No. 14-1 (Blaine Decl.) ¶ 14; ECF No. 22-1 at 3. Multiple publications described the CIA's determination as an "interim" finding, and the CIA Director himself stated that, while the agency had "reached some significant interim findings," it was "not done." Compl. ¶¶ 8–9 (collecting sources); Blaine Decl. ¶ 14. But USA Today reported on a tip from a U.S. intelligence official that, while the CIA's January 2022 report was "technically classified as an interim assessment," it was in fact a "definitive and official agency finding based on months of intensive investigation." Compl. ¶ 9 (citing Josh Meyer, *CIA rules out hostile foreign power behind medical symptoms known as 'Havana Syndrome'*, USA TODAY, Jan. 20, 2022).

A few weeks later, on February 2, 2022, the Office of the Director of National Intelligence "announced that a panel convened by the U.S. intelligence community had concluded [that] the core symptoms of [certain] unsolved [AHIs] *could* be caused by pulsed electromagnetic or ultrasonic energy." *Id.* ¶ 10 (emphasis added); *see also* ECF No. 22-1 at 6–7. "A declassified executive summary of the intelligence community's assessment found [that] the effects of the mysterious illness are 'genuine and compelling,' and that psychological factors or mass hysteria

on their own could not account for the core characteristics of [unsolved] [AHIs]." Compl. ¶ 10; *see also* ECF No. 22-1 at 9.

In March 2023, however, the Director of National Intelligence released an "updated assessment" affirming that "most [intelligence community] agencies have now concluded that it is 'very unlikely' [that] a foreign adversary is responsible for the reported AHIs," albeit with "varying confidence levels." ECF No. 20-1 at 2, 5. The CIA Director stated that he "st[oo]d firmly behind the . . . findings" of the intelligence community, and described the CIA's contributions to that analytic effort as "one of the largest and most intensive investigations in the Agency's history." *Id.* at 12. (The House Permanent Select Committee on Intelligence, in contrast, maintains that the intelligence community's 2023 conclusions on AHIs are of questionable accuracy and "not based on the available facts." ECF No. 22-1 at 3–4. It thus continues to pursue its own "efforts to understand AHIs." *Id.*)

### B.  Procedural History

On January 21, 2022, plaintiffs James Madison Project—a government accountability organization—and Brian Karem—an investigative reporter—submitted a FOIA request to the CIA that referenced the January 19, 2022 media reporting on the CIA's "interim" findings about AHIs and sought "records . . . surrounding the issuance of" that "intelligence assessment."[1] Blaine Decl. Ex. A at 1–2. Relevant here, plaintiffs requested three specific categories of documents: (1) a "copy of the Assessment," (2) "[a]ll intelligence information relied upon in formulating

---

[1] Citing to the aforementioned USA Today article, the request asserted that "[a]lthough the Assessment was widely described as an 'interim' report, it actually was not." Blaine Decl. Ex. A at 2.

3

conclusions in the Assessment," and (3) "[a]ll factual, medical and/or scientific findings made in the course of formulating the conclusions in the Assessment."[2] *Id.* at 2.

The CIA ultimately responded to plaintiffs' request as follows. Regarding part 1, which sought the "assessment" itself, the CIA stated that its search had identified three responsive documents. Blaine Decl. ¶ 14. The CIA released two in part, but withheld the third in full. *Id.* ¶ 15. As to parts 2 and 3, which sought the intelligence and factual information underlying the assessment, the CIA informed plaintiffs that it had "identified at least one record responsive to th[o]se parts," but could "[]not provide the number of responsive records or further describe them without revealing information that is itself protected from disclosure." Blaine Decl. Ex. C at 1. As the basis for all its withholdings, including its "no number, no list" response to parts 2 and 3, the CIA cited FOIA Exemptions 1 and 3, which cover classified records and records specifically exempt from disclosure by statute. Blaine Decl. ¶¶ 15–21; *see* 5 U.S.C. §§ 552(b)(1), (3).

By the time plaintiffs received the CIA's response, they had already filed this lawsuit.[3] *See* Compl. at 6–7. Once the CIA's production was complete, the agency moved for summary judgment on the grounds that it had conducted an adequate search and had released all responsive and non-exempt records. *See* ECF No. 14 (Mot.) at 2. Its motion was supported by a declaration from Vanna Blaine, a senior CIA official with original classification authority tasked with

---

[2] Plaintiffs also requested "[a]ll documentation memorializing talking points and briefing notes for U.S. Government personnel discussing the Assessment with media outlets, individual Members of Congress[,] or staff with the House Permanent Select Committee on Intelligence/Senate Select Committee on Intelligence." Blaine Decl. Ex. A at 2. But that element of the request is not at issue in this litigation. *See* ECF No. 11 ¶ 1.

[3] Plaintiffs initially sought expedited processing of their FOIA request, Compl. at 5–6, but withdrew that count after the CIA had processed all parts of the request at issue. *See* ECF No. 14 (Mot.) at 4–5.

4

"ensur[ing] that any determinations as to the release or withholding of [] documents or information are proper and do not jeopardize the national security." Blaine Decl. ¶¶ 2–3.

The Court held a hearing on the CIA's motion on July 31, 2023. There, plaintiffs' counsel stated that he had "no doubt" that some of what the CIA had withheld was properly classified, and framed his "general[] . . . request" as an ask that the CIA be ordered to file an *ex parte* declaration describing in more detail the harm to national security that would flow from disclosing that information, as needed to satisfy FOIA Exemption 1. Indeed, plaintiffs' counsel suggested that "all that [was] required" from his perspective was for the Court to review that declaration *in camera* and confirm that its contents "match[ed] up" with the CIA's arguments in its motion and declaration, which counsel characterized as too "boilerplate" to independently support the agency's withholding determinations.

Essentially in light of those arguments, the Court at the close of the hearing ordered the CIA to decide by October 2, 2023, whether it intended to file an *ex parte*, classified declaration further explaining the appropriateness of its withholdings in a way that it could not do publicly. The Court noted that, in order to grant the CIA's motion wholly based on the public record, it would need to be "very comfortable" with the "hypothetical level" of the disclosure-related harms described in the Blaine declaration. It therefore suggested that the CIA might consider providing in a classified declaration some additional detail about the "scope" of the withheld records and why, in light of those details, the agency remained unable to publicly disclose anything more than it already had.

The CIA did lodge a classified, *ex parte* declaration, *see* ECF No. 21, which the Court has reviewed carefully.

5

**II.     Legal Standard**

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. U.S. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015). In a FOIA case, summary judgment is warranted when an agency "demonstrates that no material facts are in dispute, [that] it has conducted an adequate search for responsive records, and [that] each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure" under one or more of the FOIA Act's enumerated exceptions. *Miller v. U.S. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012).

**III.    Analysis**

Plaintiffs object to both the adequacy of the CIA's search and the propriety of its withholdings. For reasons of analytical clarity, the Court will address those objections as they pertain to the distinct parts of plaintiffs' FOIA request, rather than separating them by topic. But because the same overarching principles govern the Court's analysis of those topics as to each part, it will first outline them here.

An agency has performed an adequate search for records responsive to a FOIA request when it "make[s] a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quotation marks omitted). The "adequacy of an agency's search is measured by a standard of reasonableness," *Davis v. U.S. DOJ*, 460 F.3d 92, 105 (D.C. Cir. 2006), and may be established by "reasonably detailed, nonconclusory affidavits describing [the agency's] efforts." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).

6

An agency can justify its withholdings by adducing an affidavit that "describe[s] the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption[s], and [is] not controverted by either contrary evidence in the record []or by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible," *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quotation marks omitted), and "courts generally defer to agency expertise in national security matters." *Miller*, 872 F. Supp. 2d at 18.

In addition, the Court of Appeals "has long recognized that an agency can support its withholdings through classified declarations submitted to the Court for *in camera* review when 'extensive public justification would threaten to reveal the very information for which a FOIA exemption is claimed.'" *Brick v. DOJ*, 358 F. Supp. 3d 37, 46 (D.D.C. 2019) (quoting *Lykins v. DOJ*, 725 F.2d 1455, 1463 (D.C. Cir. 1984)). Here, the Court's review of the CIA's public and classified declarations confirms that this case indeed "presents a circumstance in which there is a risk of revelation of information that compromises legitimate secrecy interests, such that the resort to an *in camera* declaration is necessary." *Id.* at 47 (quotation marks, citation, and alterations omitted). Below, the Court will explain to the extent it is able why the classified declaration supports the statements in the agency's public declaration and warrants summary judgment in the CIA's favor.

A.   **FOIA Request Part 1**

As discussed, the CIA located three records responsive to part 1 of plaintiffs' FOIA request, which, again, sought a copy of the CIA's purported January 19, 2022 "assessment" of the causes

7

of AHIs.  *See* Blaine Decl. ¶¶ 6, 12.  (Notably, according to the CIA, there exists "no singular 'Assessment' as described in Plaintiffs' FOIA request"; instead, the three responsive documents are dated between January 19 and 20 of 2022 and "encapsulate the interim findings and coincide with the timing of the media coverage specifically referenced by Plaintiffs in the request.")  *Id.* ¶ 14.  The CIA then released two of those documents in part: a five-page Top Secret report from January 20 entitled "Worldwide: Anomalous Health Incidents Probably Not Global Campaign Against US Officials" and a seven-page Secret report also from January 20 entitled "Examining Possible Natural and Environmental Causes of Worldwide Anomalous Health Incidents."  *Id.* ¶¶ 15–16; *see also* ECF Nos. 19-1 and 19-2 (redacted documents).  The CIA withheld the third document in full, but explained that it is five pages long, is classified as Top Secret, and "contains information similar in substance to one of the two documents that CIA released in part."  Blaine Decl. ¶ 17.

Plaintiffs do not dispute that the CIA conducted an adequate search for records responsive to part 1 of their request.  *See* ECF No. 19.  They object only that the CIA has not adequately justified its withholdings.  *See id.*; ECF No. 16 (Opp.) at 13–14.  Having now reviewed the agency's classified declaration, which was what plaintiffs stated was "required before th[e] Court [could] . . . render a determination on the appropriateness of the withholding," Opp. at 14, the Court disagrees.

The CIA justifies these withholdings under FOIA Exemptions 1 and 3.  Exemption 1 protects from disclosure materials that are "(A) specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy"; and "(B) are in fact properly classified pursuant to such Executive [O]rder."  5 U.S.C. § 552(b)(1).  An agency may demonstrate that Exemption 1 applies by adducing a declaration establishing that the

withheld information meets the classification requirements of Executive Order 13,526, "the operative classification order under Exemption 1." *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 940–41 (D.C. Cir. 2013). Those requirements are fourfold: classification by (1) an original classification authority, of information that (2) is owned, produced, or controlled by the U.S. government, (3) falls within one of the eight subject-matter categories listed in the Order, and (4) could reasonably be expected to result in identifiable or describable damage to the national security if disclosed. *See* Exec. Order No. 13,526, 75 Fed. Reg. 707, § 1.1(a) (Dec. 29, 2009). As to the third requirement, information subject to classification under the Order includes "foreign government information"; "intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and "foreign relations or foreign activities of the United States, including confidential sources." *Id.* § 1.4.

FOIA Exemption 3 is similar to Exemption 1: it excludes from production "information 'specifically exempted from disclosure by statute' when the statute in question 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld.'" *DiBacco v. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019) (quoting 5 U.S.C. § 552(b)(3)). Relevant here, the Court of Appeals has recognized that certain provisions of the National Security Act of 1947 and the CIA Act of 1949 are valid exempting statutes under Exemption 3. *See id.* (citing 50 U.S.C. §§ 3024(i)(1), 3507). Those statutes respectively call for the protection of "intelligence sources and methods" and "the organization or functions of the [CIA], [and] of the names, official titles, salaries or numbers of [its] personnel." 50 U.S.C. §§ 3024(i)(1), 3507.

The Blaine declaration, supplemented by the classified declaration, adequately explains why Exemptions 1 and 3 justify the agency's redactions to the first two documents and its total withholding of the third. Beginning with Exemption 1, Ms. Blaine, an original classification authority, has attested that the undisclosed information is "currently and properly classified" and is "owned by and [] under the control of the U.S. Government." Blaine Decl. ¶¶ 23, 25. Ms. Blaine also attests that the withheld information pertains to "intelligence activities . . . sources and methods" within the meaning of Executive Order 13,526. *Id.* ¶ 25. As she explains, all three responsive documents are "finished intelligence products on the topic of AHIs." *Id.* ¶ 26. The CIA determined that certain information in the two partially released documents "related to [classified] intelligence sources, methods, and activities, including the CIA's bases for the statement[s] in [the documents'] title[s]." *Id.* ¶¶ 15–16. Regarding the third document, the CIA determined that the "unique nature and sensitivity of the document" meant that it was *wholly* related to "intelligence sources, methods, and activities connected to the topic of AHIs." *Id.* ¶ 17. The classified declaration offers additional details about the withheld information that corroborate those conclusions.

Turning to the final requirement of Exemption 1—seemingly the only requirement in real dispute, *see* Opp. at 13–14—the CIA has also justified why revealing the "specific information collected" about AHIs, "the methods used" to investigate them, "or even the scope of the information collected" could reasonably be expected to harm national security. *Id.* ¶ 27–28. As Ms. Blaine explains, that is because releasing that information—which the CIA has never previously disclosed—would expose the "CIA's sources and methods for gathering [such] information, the apportionment of Agency resources allocated to gathering [such] information, the existence or nonexistence of [CIA] relationships with certain foreign entities, the CIA's collection

10

capabilities, and potentially, CIA's collection gaps, if they exist." *Id.* For instance, if the CIA released findings discussing AHIs in certain locations but not others, adversaries could glean valuable information about the CIA's relative capacity in those locations, including the extent (or absence) of its activity and sources there. *See id.* ¶ 29. The same concerns would attach to the CIA's release of data or scientific analysis, which could likewise demonstrate its abilities or lack thereof. *See id.* Disclosing such information could also reveal how seriously or not the CIA took certain aspects of the investigation into AHIs, exposing its priorities in a way that might further enable foreign intelligence services and other groups to "disrupt CIA activities or exploit perceived weaknesses." *Id.* ¶ 28.

The classified declaration substantiates these concerns as articulated in the Blaine declaration. And as to the third document, the classified declaration persuasively explains why, given the particular nature of the document, releasing any part of it could reasonably be expected to inflict harm for similar reasons. The Court finds it "unwise to undertake searching judicial review" of these "executive affidavits predicting harm to the national security." *Ctr. For Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003) (collecting cases "counseling deference in national security matters").

The Blaine declaration also explains why Exemption 3, as applicable through the National Security Act of 1947 and the CIA Act of 1949, further justifies the withholding of part 1 information. Again, those statutes respectively authorize the CIA to protect from disclosure its "intelligence sources and methods" and the personally-identifying information of CIA personnel. 50 U.S.C. §§ 3024(i)(1), 3507. Here, Ms. Blaine attests that the National Security Act "applies co-extensively to all the information protected by Exemption [1] because [the withheld] information relates to specific intelligence sources and methods." Blaine Decl. ¶ 36. But as she

11

notes, the National Security Act also extends *beyond* Exemption 1, because it additionally covers *unclassified* sources and methods, "such as classification and dissemination control markings," which "highlight areas of particular intelligence interest, sensitive collection sources or methods, foreign sensitivities, and procedures for gathering, protecting, and processing intelligence."[4]  *Id.*; *see C.I.A. v. Sims*, 471 U.S. 159, 169–70 (1985) (recognizing the "broad sweep" of the relevant provision of the National Security Act, which is not limited to "only confidential or nonpublic intelligence sources").  And Ms. Blaine further attests that some of the withheld information in the two partially released part 1 documents is protected by the CIA Act, because it concerns the "names and other personally-identifying information of Agency personnel, such as [their] functions, official titles, Agency identification numbers, and telephone numbers."  Blaine Decl. ¶¶ 15–16, 39.

The Court accepts these representations by Ms. Blaine, which plaintiffs have offered no reason to doubt.  *See Mobley v. C.I.A.*, 806 F.3d 568, 588 (D.C. Cir. 2015) (discouraging *in camera* review of documents "[w]hen an agency meets its burden through affidavits," "particularly . . . in national security . . . case[s]").  Indeed, as the CIA puts it, it is "unsurprising" that the "finished intelligence products" plaintiffs requested in part 1 should contain information related to intelligence sources, methods, and officers, whether classified or not.  *See* ECF No. 17 (Reply) at 10–11 (citing Blaine Decl. ¶¶ 15–17, 26).  The CIA has demonstrated that this information is properly withheld under Exemptions 1 and/or 3.[5]

---

[4] Classification and dissemination control markings on records "indicate the overall classification level as well as the classification of discrete portions of a document, the presence of any compartmented information, and the limits on disseminating the information."  Blaine Decl. ¶ 36.

[5] "Pursuant to the FOIA Improvement Act, an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-

B.        FOIA Request Parts 2 and 3

In parts 2 and 3 of their FOIA request, plaintiffs respectively sought "[a]ll intelligence information relied upon in formulating conclusions in [the CIA's January 19, 2022, AHI assessment]" and "[a]ll factual, medical and/or scientific findings made in the course of formulating the conclusions in the Assessment." Blaine Decl. Ex. A at 2. As noted above, the CIA issued a "no number, no list" response as to both parts—it "acknowledge[d] the existence of documents responsive to the request, but neither number[ed] nor identifie[d] them by title or description," as a standard *Vaughn* index would do. *New York Times Co. v. U.S. DOJ*, 756 F.3d 100, 105 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014); *see also ACLU v. CIA ("ACLU I")*, 710 F.3d 422, 432 (D.C. Cir. 2013) ("A *Vaughn* index indicates in some descriptive way which documents the agency is withholding and which FOIA exemptions it believes apply."). In particular, the CIA explained that providing the number of responsive records or further describing them—such as by detailing their dates, authors, page counts, or subject matter—would "reveal[] information that is itself protected from disclosure pursuant to FOIA Exemptions [1] and [3]." Blaine Decl. ¶¶ 10, 18–20, 26. The CIA also explained that, beyond confirming that "the CIA office charged with examining AHIs" is "in possession of at least one responsive record" regarding parts 2 and 3, "the CIA [did] not otherwise conduct[] a search." *Id.* ¶ 14 n.1.

---

protected interest and if its disclosure is not prohibited by law." *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018), *reconsidered in part,* 442 F. Supp. 3d 240 (D.D.C. 2020) (citing 5 U.S.C. § 552(a)(8)(A)). The FOIA Improvement Act's "foreseeable harm" requirement does not apply to Exemption 3, which pertains to "[i]nformation that is . . . exempt from disclosure by law." *Id.* n.1. And the requirement is necessarily incorporated into the Exemption 1 analysis (and thus satisfied here for the reasons above), because, as discussed, that exemption requires a showing that disclosure of the classified information "reasonably could be expected to result in damage to the national security." Exec. Order 13,526, § 1.1(a); *see also Rosenberg*, 342 F.Supp.3d at 81–89.

Plaintiffs object to both the propriety of the CIA's "no number, no list" response and the CIA's accompanying decision not to "actually search" for responsive records. *See* Opp. at 9–12, 14–15. The Court disagrees on both scores.

### 1.  Withholdings

As the CIA made clear at oral argument, it concluded from the plain text of plaintiffs' request that the actual materials sought in parts 2 and 3—the specific "intelligence information gathered or obtained by the CIA on AHIs"—would necessarily be eligible for withholding under Exemptions 1 and 3. Blaine Decl. ¶ 26. Beginning with Exemption 1, Ms. Blaine attests that, as with many aspects of the records sought in part 1, a significant portion of that information is owned and controlled by the U.S. government; is currently and properly classified; and pertains to intelligence activities, sources, or methods, pursuant to Executive Order 13,526. *Id.* ¶ 25. Disclosure of that classified information could thus be reasonably expected to harm national security for the same reasons discussed above, with respect to the withheld part 1 information. *See id.* ¶¶ 27–29, 32. And while the information sought in parts 2 and 3 also includes *unclassified* intelligence source information, such as classification and dissemination control markings, as well as information pertaining to CIA personnel, Ms. Blaine further attests that—again as with part 1— that additional information is protected by Exemption 3, via the National Security and CIA Acts. *Id.* ¶¶ 21–22.

Plaintiffs do not appear to seriously dispute that the contents of the materials they seek in parts 2 and 3—i.e., the CIA's actual intelligence conclusions—are exempt from disclosure under Exemption 1, Exemption 3, or both. *See* Opp. at 14–15; *cf. Bassiouni v. C.I.A.*, 392 F.3d 244, 246 (7th Cir. 2004) (CIA could "not contend that the *contents* of all [requested] documents [] [we]re classified" where they "certain[l]y . . . contain[ed] many U.N. reports, newspaper clippings, and

14

other non-classified materials"). Instead, they challenge the CIA's decision to withhold under those exemptions even "details regarding the *volume* and *nature* of that responsive information"—i.e., the CIA's failure to "mere[ly] disclos[e] the details of a normal *Vaughn* index." Blaine Decl. ¶ 25 (emphasis added); Opp. at 15. It is true, as plaintiffs note, that a "no number, no list" response—which the Court of Appeals has described as effectively a "radically minimalist" form of a *Vaughn* index—can "only be justified in unusual circumstances, and only by a particularly persuasive affidavit." *ACLU I*, 710 F.3d at 433; *see also New York Times Co.*, 756 F.3d at 121–22. But with the benefit of the CIA's classified declaration, and given plaintiffs' acknowledged request for bare intelligence information, the Court finds that such unusual circumstances are present here.

As the Blaine declaration explains, disclosing "[e]ven the number of documents responsive to part 2 or part 3 of the request, or the dates or page counts of those documents, would reveal intelligence sources and methods by potentially identifying the total amount of information gathered or obtained by the CIA, and when the CIA gathered or obtained information or expended intelligence-gathering resources to do so." Blaine Decl. ¶ 26. Ms. Blaine attests that disclosing that kind of "scope" information would expose "the CIA's and the U.S. Government's intelligence capabilities and methods" in a manner that could permit our enemies to "generally enhance [their] intelligence or counterintelligence activities at the expense of the United States' national security." *Id.* ¶¶ 28–29.

Importantly, "[a]ny information at all [would] provide[] insight into what the CIA knows or is capable of." *Id.* ¶ 29. An adversary could draw an equally valuable inference from the revelation of a small number of responsive documents—which might suggest a limitation on the CIA's intelligence gathering or its focus on a non-AHI intelligence interest—as it could from the

15

revelation of a large number of responsive documents—which might suggest the converse. *See id.* ¶ 30. Similarly, adversaries could draw any range of valuable inferences from whatever qualitative descriptions the CIA might offer about the intelligence information sought in parts 2 and 3. It would make no difference, for instance, whether the documents were scientific studies or another type of report, or whether they pertained to a particular time period or subject matter, because any such insight would shed light on the "CIA's intelligence-gathering means and capabilities." *Id.* ¶ 29, 32. That is especially true where adversaries could "compare" any released details "against information already publicly available or in their protection," such as by reasoning that, based on the dates of certain documents, the CIA does or does not have sources in a particular location. *Id.* ¶¶ 31–32.

Plaintiffs contend that these explanations from the Blaine declaration are too "broad and vague" to support the CIA's "no number, no list" response. Opp. at 15. To be sure, the Court sympathizes with plaintiffs' concern: that is why it suggested that the CIA lodge a classified declaration to bolster its publicly available rationale. But having now reviewed that declaration—which contains some (but by no means all) of the information that would appear in a *Vaughn* index—the Court concludes that the CIA has carried its burden of showing that Exemptions 1 and 3 protect disclosure of the number and listing of the documents responsive to parts 2 and 3 of plaintiffs' request.

In its classified declaration, the CIA provided a more detailed explanation of how that scope of information implicates CIA intelligence activities, sources, and methods, as well as how its disclosure could harm national security in the manner that the CIA has described publicly. Although the Court of course cannot discuss those details and examples here, they persuade it that the number and listing of responsive documents must remain secret because any insight into the

16

scope of the CIA's intelligence efforts regarding AHIs could aid foreign adversaries in their efforts to evade or undermine the CIA. *See Bassiouni*, 392 F.3d at 246–47 (approving "no number, no list" response because "the dates, numbers, and general subjects of documents" could "help anyone learn who supplied the information," "how the CIA is deploying its resources[,] and what subjects it is investigating"); *New York Times Co.*, 756 F.3d at 122–23 (upholding "no number, no list" response where "a large number [of responsive documents concerning a contemplated military operation] might alert the enemy to the need to increase efforts to defend against attacks or to avoid detection and a small number might encourage a lessening of such efforts"); *see also, e.g.*, *Open Soc'y Just. Initiative v. Cent. Intel. Agency*, 505 F. Supp. 3d 234, 248 (S.D.N.Y. 2020) (permitting "no number, no list" response where agency's classified filings "validate[d]" its "representations" that disclosing the "dates, nature, and length" of documents related to the killing of Jamal Khashoggi could give adversaries "insight into [] the United States' intelligence capabilities and interests").

### 2. Adequacy of the Search

Plaintiffs also maintain that, even if the CIA were otherwise permitted to issue a "no number, no list" response to parts 2 and 3 of their request, it was not permitted to do so without first conducting an actual search for responsive records. *See* Opp. at 11–12. The parties agree that "no court has squarely addressed" that particular question. Reply at 2; *see also* Opp. at 10–11. But it is well established that, when an agency is justified in *wholly* "refusing to confirm or deny its possession of responsive documents"—a measure known as a *Glomar* response—"the agency need not conduct any search for responsive documents," because doing so would be "meaningless." *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs.*, 745 F.3d 535, 540 (D.C. Cir. 2014); *Elec. Priv. Info. Ctr. v. Nat'l Sec.*

17

*Agency*, 678 F.3d 926, 934 (D.C. Cir. 2012). The Court agrees with the CIA that "[t]he same logic applies here." Mot. at 9.

As discussed, the CIA concluded from the face of plaintiffs' request that the contents of the materials they sought in parts 2 and 3 were exempt from disclosure under Exemptions 1 and 3, because they comprise the CIA's specific intelligence conclusions. *See* Blaine Decl. ¶¶ 25–26. The CIA further concluded that it could not release any quantitative or qualitative information about those records as would be done on a traditional *Vaughn* index, because all those descriptive details are *also* exempt from disclosure under Exemptions 1 and 3. *See id.* ¶ 26. Having determined for the reasons above that both decisions were proper, the Court sees no utility in the CIA's conducting a further search, because nothing the agency uncovered could be released. The CIA thus "satisfied its duty under FOIA to search for . . . all nonexempt information" responsive to parts 2 and 3 of plaintiffs' request. *Insider, Inc. v. U.S. Gen. Servs. Admin.*, 635 F. Supp. 3d 1, 2 (D.D.C. 2022), *aff'd sub nom. Insider Inc. v. Gen. Servs. Admin.*, 92 F.4th 1131 (D.C. Cir. 2024). Plaintiffs' citations to cases where the agency *opted* to conduct a search prior to issuing a "no number, no list" response, *see* Opp. at 11, do not persuade the Court otherwise. *Cf. Elec. Priv. Info. Ctr.*, 678 F.3d at 934 (cases in which agencies conducted searches "of [their] own volition prior to issuing [a] *Glomar* response" did not "hold—or even imply—that such a search . . . is *required*").

### C. Segregability

Even when a FOIA exemption is properly asserted, "it has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998) (alteration omitted); *see also* 5 U.S.C. § 552(b). "[I]t is error for a district court to simply approve the withholding of

an entire document without entering a finding on segregability, or the lack thereof." *Kimberlin*, 139 F.3d at 950.

Here, the Court's segregability inquiry is quite straightforward. Ms. Blaine attested that, "[w]ith respect to the two documents released in part, and the one document withheld in full in response to part 1 of the request, the CIA conducted a line-by-line review of each of these documents, and released all reasonably segregable, nonexempt information that could be released." Blaine Decl. ¶ 40. And "[w]ith respect to the CIA's response to parts 2 and 3 of the request," Ms. Blaine "determined that no records or portions of records may be released," for the reasons discussed above. *Id.* ¶ 41. The Court credits these statements from the Blaine declaration, which, when coupled with the agency's elaboration of its withholding determinations in its public and classified declarations, "show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008); *see also, e.g.*, *Freeman v. Fed. Bureau of Investigation*, 2022 WL 4365734, at *2–3 (D.D.C. 2022).

## IV. Conclusion

For the foregoing reasons, the Court will grant the CIA's motion for summary judgment, ECF No. 14. The Court will, however, require the CIA to review its classified declaration and, to the maximum extent possible, file a redacted version of the declaration on the public docket. An Order will accompany this Opinion.

DATE: August 27, 2025

CARL J. NICHOLS
United States District Judge